UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSE GARCIA,

                                        Petitioner,


                    -against-                                          02 Civ. 2312 (LAK)


LEONARD PORTUONDO, et al.,

                                        Respondents.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**OPINION**
**(Corrected)**


          Appearances:

                         Martin Klotz
                         Matthew Bosher
                         Stephen Vogel
                         WILLKIE FARR & GALLAGHER, LLP
                         *Attorneys for Petitioner*


                         Nancy D. Killian
                         Assistant District Attorney
                         ROBERT T. JOHNSON
                         DISTRICT ATTORNEY FOR BRONX COUNTY
                         *Attorney for Respondents*

LEWIS A. KAPLAN, *District Judge*.

Petitioner Jose Garcia was convicted in New York Supreme Court, Bronx County, in 1993 for the second-degree murder of Cesar Vasquez and sentenced principally to a term of imprisonment of 25 years to life. The conviction was affirmed by the First Department, and leave to appeal to the Court of Appeals was denied,[1] as were motions in the state court for post-conviction relief.[2] Garcia now seeks a writ of habeas corpus, contending that he (a) received ineffective assistance of counsel at trial, and (b) actually is innocent of the crime of which he was convicted. In a report and recommendation, dated August 30, 2006 (the "Report and Recommendation"), Magistrate Judge Kevin N. Fox recommended that the petition be granted. Respondent objects.[3]

*Background*

Cesar Vasquez was murdered on July 16, 1991, around 11:45 p.m. in the Bronx. Petitioner Jose Garcia was apprehended on August 2, 1991, and charged with second degree murder.

Garcia long has maintained his innocence and, indeed, that he was in the Dominican Republic when Vasquez was murdered. He contends that he was arrested at La Union International Airport in Puerto Plata, Dominican Republic, on July 15, 1991, for attempting to travel with false

---

[1]
     *People v. Garcia*, 219 A.D.2d 541, 632 N.Y.S.2d 62 (1st Dep't 1995), *leave to appeal denied*, 88 N.Y.2d 847, 644 N.Y.S.2d 694, 667 N.E.2d 344 (1996).

[2]
     *See* Resp. Mot. Dismiss Exs. 6 (First Department decision, dated July 23, 1998, denying *coram nobis* motion on grounds of ineffective assistance of appellate counsel), 13 (Supreme Court, Bronx County decision, dated December 7, 2000, denying motion to vacate conviction on grounds of ineffective assistance of trial counsel).

[3]
     Garcia names as respondents both Leonardo Portuondo, superintendent of Shawangunk Correctional Facility, and the State of New York. As Portuondo is Garcia's alleged custodian, "respondent" subsequently refers to him alone.

papers. He was jailed overnight and released on July 16, the day of the murder, after his wife posted bail. Garcia claims that he remained in the Dominican Republic until he flew to the United States and was arrested on August 2, 1991, for entering illegally. The jury, however, heard almost nothing of this alibi.

A.     *The Trial*

1.     *The Alibi Notice*

Garcia was represented at trial by Jorge Guttlein, Esq. Before commencement of the trial, Guttlein submitted an amended alibi notice[4] stating that he intended to present evidence that Garcia was not in the Bronx at the time of Vasquez's murder, including (1) documents concerning Garcia's August 2, 1991 arrest in California for attempting to enter the United States illegally, (2) "[r]eports from the [Dominican national police] regarding Mr. Garcia's incarceration during the relevant time period in the Dominican Republic on July 16, 1991 for seeking to leave the Dominican Republic with false papers," (3) the testimony of Gabriella Peña regarding Garcia's departure to the Dominican Republic on June 22, 1991, and (4) the testimony of Ana Ortega regarding Garcia's incarceration in the Dominican Republic.[5]

Guttlein attached documents to the alibi notice tending to show that Garcia was incarcerated in the Dominican Republic on July 15, 1991 and released the following day, including (1) a form reflecting Garcia's release on bail on July 16, 1991 from a Dominican jail, (2) a

---

[4]

A copy of the original notice of alibi is not in the record before the Court.

[5]

Killian Aff., Oct. 14, 2004, Ex. 8 (amended alibi notice).

certification of the form, (3) a certification of the certification by an official of the Dominican State Department, and (4) a certification by a United States Embassy official of the signature and seal of the official of the Dominican State Department (the "Alibi Notice Documents").[6]

Guttlein twice stated to the trial court that he intended to offer these documents, but that their admissibility might be open to question. He raised the issue first at a pretrial hearing, stating that he had documents "certified by the American consulate as being official records of the Dominican Republic" that tended to show that Garcia was incarcerated in the Dominican Republic on July 16, 1991. He requested the opportunity to address the issue of whether additional certification from the Dominican consulate was required for the documents to be admissible. The trial court postponed discussion of the issue indefinitely.[7]

Guttlein next raised the issue shortly after opening statements, outside the presence of the jury. He stated again that he was unsure whether the Alibi Notice Documents required additional certification from the Dominican consulate, and the parties and trial court briefly discussed the issue of authentication of foreign public records.[8] The trial court expressed doubt as to the documents' admissibility and suggested that Guttlein brief the issue.[9] Guttlein, however, filed

---

[6]

The documents that were attached to the amended alibi notice were not included in the copy submitted to this Court. Guttlein stated in an affidavit, however, that he presented the documents listed in the text to the trial court, *see* Guttlein Aff. ¶¶ 4-5 & Ex. 1, and Judge Fox found that these documents were the attachments. Report and Recommendation 3-4, 37-39. Respondent does not dispute this.

[7]

*See Wade* Hearing, Nov. 24, 1992 at 303-04.

[8]

*See* Trial at 71-86.

[9]

*Id.* at 75.

4

no brief. Nor did he ever offer the documents into evidence.

        *2.*      *The People's Case*

        The prosecution's case consisted almost entirely of the testimony of Penny Denor. Denor testified that, on July 16, 1991, the night of the murder, she looked out of her fourth-floor window for her fourteen-year-old son. After seeing her son directly beneath her window, she saw three men with handguns get out of a blue vehicle that was double-parked nearby. She looked at the face of the driver and his gun. She testified that she saw also the man who got out of the right front seat, noticing in particular his flowered shirt, and the other passenger, another man. Fearing for her son's safety, she ran down the hallway and stairs to the courtyard and heard five or more gunshots. When she arrived in the courtyard, she saw a body on the ground and then saw three men run through the gate and get into the blue vehicle.[10]

        Denor made an in-court identification of Garcia as the front seat passenger.[11] Further, she testified that she had been present at a lineup approximately five months after the murder. Detective Pezzullo testified that Garcia had been in the number five position.[12] Denor said that she initially had identified someone other than the man in the number five position. Immediately upon leaving the lineup room, however, she said she had told Detective Pezzullo that she had identified the wrong person and that she had known all along that the person she meant to identify was the

_____

[10]        *Id.* at 237-40.

[11]        *Id.* at 241.

[12]        *Id.* at 607.

5

individual in the number five position.[13]

3.      *The Defense*

a.      *Cross-Examination of Denor*

Guttlein vigorously attempted to discredit Denor, establishing on cross-examination that Denor had been under the effects of Valium on the night of the murder, that Valium made her sleepy, and that she was on Thorazine during the trial.[14]

Guttlein exposed also a number of inconsistencies in Denor's testimony. The first concerned Denor's lineup identification. Denor testified that the first man she identified in the lineup had been in the number four position. At a previous hearing, however, she had acknowledged that the transcript from the lineup reflected that the man she initially identified had been in the number two position.[15]

The second inconsistency concerned Denor's description of the passenger as having worn a flowered shirt. Guttlein established that Denor had testified at a previous proceeding that it was the driver and not a passenger who had worn the flowered shirt.[16] Moreover, a police officer who

---

[13]

*Id.* at 258-63.

[14]

*Id.* at 296-303, 372-74. Thorazine, known also as chlorpromazine, typically is used to treat psychotic disorders and symptoms such as hallucinations, delusions, and hostility. *See, e.g.*, Nat'l Insts. Health, MedlinePlus (available at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682040.html) (last visited Dec. 13, 2006).

[15]

*Id.* at 319-321. *See also Wade* Hearing, Nov. 30, 1992 at 176-78.

[16]

Trial 326-27.

interviewed Denor on the night of the murder testified that, according to his interview notes, Denor then described the three men as having worn hooded sweatshirts, with no mention of a flowered shirt.[17]

        *b.*    *Griselda Vasquez*

        Guttlein called a single witness, Griselda Vasquez, the victim's sister. Ms. Vasquez testified that, on July 16, 1991, she looked out her window and saw a man get into a car. She then realized that her brother was lying on the ground and ran down the stairs to the courtyard where she found him dead. Ms. Vasquez stated that she had known petitioner as a friend of her brother's, that she had seen him before many times, and that she had not seen him outside her window on the night of the murder.[18] In addition, Ms. Vasquez testified that she had spoken to Garcia by telephone shortly after the murder and that he was in the Dominican Republic at the time.[19] The prosecution established on cross-examination, however, that Ms. Vasquez had no personal knowledge of Garcia's whereabouts at the time, as she had not dialed the telephone.[20]

---

[17]
    *Id* at 539-40.

[18]
    *Id.* at 763-72. On cross-examination, Ms. Vasquez testified that she saw no one else in the stairway, and that her mother was out of the country at the time. *Id.* at 796-97. After her testimony, the People called Edmundo Vargas as a rebuttal witness, who testified that he heard Ms. Vasquez speaking to her mother in the stairway, thus contradicting her testimony. *Id.* at 858-59.

[19]
    *Id.* at 770.

[20]
    *Id.* at 805.

4.       *The Trial's Conclusion*

In closing, Guttlein emphasized the weakness of the prosecution's case, Denor's lack of credibility, and the fact that the victim's own sister exculpated Garcia. He commented upon Ms. Vasquez's belief that Garcia had been in the Dominican Republic when she spoke to him after the murder in a single sentence.[21]

Garcia was convicted and sentenced. He now contends that Guttlein's failure to present his alibi was constitutionally deficient representation.

B.       *Procedural History*

The relevant details of Garcia's state post-conviction proceedings are set forth in *Garcia v. Portuondo* ("*Garcia II*"),[22] familiarity with which is assumed.

On May 10, 1999, Garcia filed a petition for a writ of habeas corpus, raising no claims but asking instead for an extension of time in which to file an application for habeas relief. This Court granted respondent's motion to dismiss the petition as untimely.[23] Returning to state court, Garcia on September 1, 2000 filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10.[24] The New York Supreme Court, Bronx County, denied the

---

[21]

      *Id.* at 909.

[22]

      334 F. Supp. 2d 446, 447-50 (S.D.N.Y. 2004).

[23]

      *Garcia v. Portuondo*, No. 99 Civ. 4519 (LAK), 2000 WL 246407 (S.D.N.Y. Mar. 3, 2000).

[24]

      N.Y. CRIM. PROC. LAW § 441.10 (permitting trial court to vacate conviction upon motion by defendant based on deprivation of constitutional rights at trial).

8

motion on December 7, 2000, stating that "[a] review of the trial record fails to substantiate allegations of ineffective assistance of counsel."[25]

On April 12, 2002, petitioner sought leave to file a successive habeas corpus petition pursuant to 28 U.S.C. § 2244(b),[26] arguing that his initial petition had not been a habeas petition but a request for an extension of time. The Second Circuit denied the successive petition application as unnecessary because Garcia's initial petition had not raised any claims and therefore had not been decided on the merits, and transferred the matter to this Court.

Garcia now argues that the state court's December 7, 2000 decision denying his motion to vacate was "an unreasonable application of[] clearly established Federal law" under 28 U.S.C. § 2254(d)(1).[27]

In November 2002, this Court denied respondent's motion to dismiss the petition as untimely, finding that the statute of limitations was tolled because Garcia's was one of the

---

[25]

     *See* Resp. Mot. Dismiss Ex. 13.

[26]

     Section 2244(b)(2) enumerates the circumstances in which a federal court may entertain "a second or successive habeas corpus application under section 2254 that was not presented in a prior application." 28 U.S.C. § 2244(b). One such circumstance is when "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.* § 2244(b)(2)(B)(ii).

[27]

     Section 2254(d) provides that where a state court has adjudicated the merits of a claim raised in federal habeas corpus, a writ may issue only if the state court's adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts in light of evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 407-08 (2000) (state court decision involves an "unreasonable application" of Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular petitioner's case").

9

"exceedingly rare case[s] in which the petitioner makes out a credible claim of actual innocence."[28]
It appointed counsel and referred the matter to Magistrate Judge Kevin N. Fox.

C.      *The Hearing*

        Judge Fox held a hearing that confirmed that Guttlein had documentary evidence that
Garcia was in the Dominican Republic on the day of the murder and knew of several witnesses who
were willing to corroborate Garcia's story. It revealed also that Guttlein, had he conducted a proper
investigation, would have discovered even more evidence to bolster Garcia's defense.

        1.      *Evidence Available at the Time of Trial*

                a.      *Documentary Evidence*

        Guttlein stated in his affidavit that at the time of trial he had possessed the Alibi
Notice Documents, which Garcia's family members provided him.[29] In addition, he testified at the
hearing that he possessed copies of three additional documents, signed by Dominican police officers,
describing Garcia's arrest on July 15, 1991 for attempting to travel on a passport in the name of
Ferdinand Caraballo, his detention, and his presentment on a complaint on July 16, 1991 (the
"Dominican Police Documents").[30] All three listed the number of the flight Garcia attempted to

---

[28]

        *Garcia II*, 334 F. Supp. 2d at 462.

[29]

        *See* Guttlein Aff. ¶ 4 & Ex. 1.

[30]

        Judge Fox Hearing, May 3-13, 2005 ("Judge Fox Hearing") at 5; Pet. Mot. Vacate Exs.
        H2.1-2.2 ("Informative Note," dated July 15, 1991); H3.1-H3.2 (Memorandum from
        Forgery Investigation Officer to Legal Counsel of the Department of Puerto Plata, dated
        July 16, 1991); H3.5-H3.6 (Memorandum from Assistant Legal Counsel to Magistrate

10

board on July 15, included the number of the fictitious passport and tourist card Garcia was trying

to use, and noted that the forged documents were in the name of Ferdinand Caraballo. One of these

statements listed Garcia's national identity number,[31] and another was certified as being a true copy

of the original document.[32]

Guttlein testified that he made no efforts to verify the authenticity of any of the

documents in his possession. Nor did he seek to obtain additional documentary evidence that would

have supported Garcia's alibi.[33]

b.      *Testimonial Evidence*

Guttlein knew also that several witnesses were prepared to testify to Garcia's alibi.

As the alibi notice indicated, Guttlein knew that Gabriella Peña, Garcia's girlfriend at the time of the

murder,[34] could have testified that Garcia traveled to the Dominican Republic on June 22, 1991, and

that Ana Ortega, Garcia's wife, could have testified that Garcia was incarcerated in the Dominican

Republic and released on the day of the murder.

---

District Attorney, dated July 16, 1991).

[31]
        Pet. Mot. Vacate Exs. H2.1-2.2 ("Informative Note," dated July 15, 1991) (bearing identity
        number of Jose Garcia, 51917-02).

[32]
        *Id.* Exs. H3.5-3.6 (Memorandum from Assistant Legal Counsel to Magistrate District
        Attorney, dated July 16, 1991), H3.3-3.4 (certification by Assistant Legal Counsel of the
        Puerto Plata police).

[33]
        Guttlein Aff. ¶ 9; Judge Fox Hearing 60.

[34]
        *See generally*, Killian Aff., Oct. 14, 2004, Ex. 13 ("Peña Interview") (Sept. 11, 1992
        interview of Gabriella Peña by Assistant District Attorney William Zelenka)

Further, Guttlein stated in his affidavit that he was aware that Ortega's mother and other witnesses could have testified to Garcia's presence in the Dominican Republic at the time of the murder. He stated that he believed these individuals would have provided truthful testimony, but that he did not interview them because they were relatives and friends of Garcia's wife and therefore were not likely to have been credited by the jury.[35] Ortega testified also that she told Guttlein that Garcia had been with her in the Dominican Republic at the time of the murder and that her mother, Isabel Filpo (sometimes Batista), her cousins, Leonora and Cristian Filpo, and her friend, Alsacia Encarnacion, could have backed up her story.[36]

2.      *New Evidence*

a.      *Documentary Evidence*

The hearing revealed also that Guttlein would have discovered more evidence to support Gacria's alibi if he had looked for it. In conducting their own investigation, Garcia's current appointed counsel obtained (1) a copy of Garcia's Dominican national identity card, authenticated through Ortega's testimony,[37] bearing Garcia's photograph and national identity number;[38] (2) an

---

[35]      Guttlein Aff. ¶ 9.

[36]      Judge Fox Hearing 247. Judge Fox implicitly credited this portion of Ortega's testimony in the Report and Recommendation, relying on it to find that Guttlein was ineffective in failing to interview individuals he knew could provide exculpatory testimony. *See* Report and Recommendation 44.

[37]      Judge Fox Hearing 278-279.

[38]      Pet Ex. 10

arrest intake form, identifying Garcia by name and national identity number, showing that Garcia

was arrested in the Dominican Republic on July 15, 1991, which the parties stipulated was shown

to Garcia's current legal team at the Puerto Plata precinct of the Dominican national police;[39] (3) a

Dominican bail document ordering Garcia's detention until payment of bail,[40] which Ortega testified

she was given at the Puerto Plata courthouse after paying Garcia's bail and presented it at the police

station to obtain his release;[41] (4) a copy of an airline ticket in the name Ferdinand Caraballo for a

flight on June 22, 1991 from New York to Puerto Plata, with a return flight scheduled for July 18,

1991,[42] which Garcia testified was given to him immediately before his arrest at the Puerto Plata

airport on July 15, 1991;[43] (5) a receipt for the airline ticket, attached to a declaration of the president

of Anabella Tours, Inc., a travel agency located in Bronx County, that the receipt was made during

the regular course of the agency's business, maintained in the agency's records, and provided to

---

[39]

See Pet. Ex. 21. Garcia's current legal team was permitted to examine but not copy the document. Judge Fox Hearing 77-78 (testimony of Stephen Vogel).

[40]

Pet. Ex. 5.

[41]

Judge Fox Hearing 223-225. It is possible Guttlein possessed this document at the time of trial. Ortega testified that she gave the original to Guttlein and retained a photocopy for herself. *Id.* 224. In addition, the document was included in the file of Garcia's appellate counsel. Resp. Ex. I at 305.

[42]

Pet. Ex. 20. As with the bail document, it is possible Guttlein possessed the copy of the airline ticket at the time of trial as well. *See* Report and Recommendation 38-39. Garcia testified at the hearing that he provided it to Guttlein before trial, Judge Fox Hearing 686-88, and it was included in the file of Garcia's appellate counsel, Resp. Ex. I at 1.

[43]

Judge Fox Hearing 677-688.

13

Garcia's legal team after a search of those records;[44] and (6) a photocopy of an unused boarding pass for a July 15 flight from Puerto Plata to New York, again in the name Ferdinand Caraballo,[45] which Garcia testified he received at the Puerto Plata airport on July 15, shortly before being arrested for attempting to travel with false documents.[46]

####     b.    Testimonial Evidence

In addition, a thorough interview of Ortega and the individuals she informed Guttlein could have corroborated the alibi would have produced substantial testimonial evidence supporting Garcia's defense. Five witnesses submitted affidavits stating that Garcia was in the Dominican Republic before and after the murder to attend mourning services for his deceased friend, Australia Maria Sanchez (known as "Niña").[47] Two witnesses stated in affidavits that they saw or spoke with

---

[44]

Pet. Ex. 24.

[45]

Pet. Ex. 20.

[46]

Judge Fox Hearing 685.

Judge Fox declined to admit photocopies of the airline ticket, boarding pass, and Garcia's national identity card. Petitioner objected to these rulings. In an order, dated October 26, 2006 (docket item 61), this Court sustained the objections and admitted the documents.

[47]

See Pet. Ex. 3 (affidavits of Jose Dario Filpo Filpo and Zoila Nazarena Filpo Marte); Pet Ex. 16 (affidavit of Jose Dario Burgos); Pet. Ex. 4 (affidavit of Franklin Antonio Diaz Filpo); Pet. Ex. 15 (affidavit of Ana Delia Filpo). Ortega stated in an affidavit also that she drove Garcia to the Puerto Plata airport between 1:00 and 3:00 p.m. on July 15 and did not see him again until she posted his bail at 3:00 p.m. on July 16. See Pet Mot. Vacate Exs. H3.3-H3.6.

14

Garcia in Matanzas, Dominican Republic, between 7:00 and 8:00 p.m. on July 16.[48] One witness swore that she saw Garcia in Matanzas on the night of July 16.[49] Another, Alsacia Encarnacion, submitted an affidavit stating that she learned of the Vasquez murder after midnight on July 16, contacted Garcia and Ortega at their house in Matanzas, and brought them back to her house, where Garcia spoke with Griselda Vasquez by telephone.[50]

Live testimony further corroborated the alibi. Encarnacion and Ortega testified before Judge Fox that Garcia attended Niña's prayer service on the night of July 16 and that Garcia was in Matanzas shortly after midnight when Encarnacion awakened him and he spoke with Griselda Vasquez.[51] Isabel Filpo (Batista) testified that Garcia was at her house on the evening of July 16 and that Garcia stayed with her in the Dominican Republic through the beginning of August.[52] Leonora Filpo, Cristian Filpo, and Alicia Burgos testified that they saw Garcia at several of Niña's prayer sessions.[53] Gabriella Peña testified that she spoke to Garcia by phone when he was in the Dominican

---

[48]

See Pet. Ex. 19 (affidavit of Cristian Filpo); Pet Mot. Vacate Exs. B1-B2 (affidavit of Leonora Pabon).

[49]

See Pet Mot. Vacate Exs. D1-D2 (affidavit of Isabel Batista).

[50]

See Pet Mot. Vacate Exs. A1-A2.

[51]

Judge Fox Hearing 212-33 (testimony of Ana Ortega); id. at 300-05 (testimony of Alsacia Encarnacion)

[52]

Id. at 559-64.

[53]

Id. 140-86 (testimony of Leonora Filpo), 583-87 (testimony of Cristian Filpo), 612-17 (testimony of Alicia Burgos). This testimony was partly corroborated by a prayer card memorializing Niña's death on July 10, 1991. Pet Ex. 6. Isabel Filpo (Batista) testified that Niña's death was followed by a traditional nine-day mourning period and that this prayer card was distributed at the final prayer service for Niña on the ninth day. Judge Fox

Republic several days before the murder and that she discussed the circumstances of his July 15 arrest when they spoke again in early August.[54] Finally, Garcia himself testified to his alibi.[55]

Not all of the new evidence was exculpatory. Respondent produced evidence indicating that Vasquez possibly was responsible for losing drugs that had belonged to Garcia and that both he and Garcia were romantically involved with the same woman,[56] thus establishing a motive. Moreover, respondent established that Denor had identified not only Garcia in a lineup, but also his co-defendant, a fellow drug dealer from the same block in the Bronx.[57]

c.    Garcia's Appellate Counsel

Finally, the hearing revealed that the file of Garcia's state court appellate counsel contained a copy of the June 22, 1991 airline ticket to the Dominican Republic in the name of Ferdinand Caraballo, with a return flight scheduled for July 18. It contained also a note from appellate counsel's then-law partner stating that Garcia's wife had visited his office and explained that Garcia had been incarcerated in the Dominican Republic until 3:00 p.m. on July 16, 1991.[58]

---

[54]    Hearing 479-80.

[55]    *Id.* 788-94.

[56]    *Id.* 676-714.

[57]    *See* Peña Interview at 22-24.

[58]    *See id.*; Judge Fox Hearing 839-41 (testimony of Gabriella Peña).

    *See* Resp. Ex. I at 1 (airline ticket with note); Judge Fox Reopened Hearing, Nov. 9, 2005 ("Judge Fox Reopened Hearing") at 23-24.

16

Appellate counsel testified that he had had some correspondence with Garcia from 1993 to 1995, and that Garcia then had mentioned his July 15-16, 1991 detention in the Dominican Republic,[59] but had not mentioned the names of individuals who could have placed him in the Dominican Republic at the time of the murder.[60]

D.    *The Report and Recommendation*

Judge Fox concluded that Guttlein's performance was unconstitutionally deficient in at least two respects. First, Guttlein failed to present alibi evidence known to him at the time. When the court expressed doubt about the admissibility of the Alibi Notice Documents and asked Guttlein to brief the issue, he conducted no legal research, submitted no brief, and "simply abandoned altogether any effort to establish Garcia's alibi by this method."[61] In addition, Guttlein failed to call witnesses he knew could have corroborated Garcia's alibi.

Second, Judge Fox found that Guttlein failed to investigate Garcia's whereabouts on July 16, 1991. He did not have an investigator seek police records or other documents in the Dominican Republic relating to Garcia's incarceration. He failed to investigate relevant travel documents or records of phone calls that Garcia supposedly made from the Dominican Republic on or after July 16. He failed also to interview Ortega about the alibi or to contact the witnesses she told him could corroborate her testimony.

---

[59]

*See, e.g.*, Resp. Ex. I at 31-33 (letter dated June 15, 1993); *see also, e.g.*, Resp. Ex. I at 36-39 (letter dated January 17, 1995); Judge Fox Reopened Hearing 17-18.

[60]

*See generally*, Judge Fox Reopened Hearing 3-29; Resp. Ex. I (Wilson file).

[61]

Report and Recommendation 39.

17

Had Guttlein performed adequately, he would have uncovered additional evidence that, if credited by the jury, would have established that Garcia flew to the Dominican Republic on June 22, 1991, attempted to board a flight back to New York on July 15, was arrested for attempting to board this flight with forged documents, was incarcerated in a Dominican jail that day, was not released until the afternoon of July 16, and remained in the Dominican Republic until well after the murder.

Judge Fox concluded that Guttlein's failure to investigate Garcia's alibi, or offer evidence he knew supported it, was ineffective assistance. Furthermore, this deficient performance was prejudicial. The jury heard no evidence that Garcia was in the Dominican Republic at the time of the murder, and the now-complete record does not strongly support the conviction.

*Discussion*

In reviewing the Report and Recommendation, the Magistrate Judge's findings are reviewed *de novo*. The Court may accept, reject, or modify any finding of the Magistrate Judge.[62] Where the Magistrate Judge has made findings regarding witness credibility, however, the Court should not reject such findings unless it has heard the testimony itself.[63]

A.    *Statute of Limitations*

Respondent argues that the petition is time-barred because it was filed outside the

---

[62]

Fed. R. Civ. P. 72(b); Rule 8(b), Rules Governing Section 2254 Cases in the United States District Courts.

[63]

*Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999).

18

one-year limitations period provided by the Antiterrorism and Effective Death Penalty Act ("AEDPA").[64] He contends further that the statute was not tolled because Garcia did not make out a credible claim of actual innocence.

The Court already has decided this issue. In November 2002, respondent moved to dismiss the petition as untimely. In *Garcia II*, the Court found that "the running of the AEDPA statute of limitations is equitably tolled in the exceedingly rare case in which the petitioner makes out a credible claim of actual innocence. This is such a case."[65] Respondent has offered no persuasive reason to revisit that conclusion. Even if it were revisited, the Court, as will appear, would reach the same result.

1.      *Alibi Witness Affidavits*

First, respondent contends that this Court was misled by the affidavits of Garcia's alibi witnesses in denying the motion to dismiss in 2002. He relies especially on the affidavit of Isabel Batista, Garcia's mother-in-law. He claims that Batista had been using her maiden name, Filpo, for many years, and that her failure to use that name in her affidavit concealed Garcia's relationship to her and other affiants. The claim, however, is without merit. Batista stated in her affidavit that she is Garcia's mother-in-law.[66]

---

[64]

28 U.S.C. § 2244(d)(1) (requiring a habeas petition of a state prisoner to be filed within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review").

[65]

334 F. Supp. 2d at 462.

[66]

Pet Mot. Vacate Exs. D1-D2.

19

Respondent correctly notes that other affidavits submitted by Garcia on the motion to dismiss failed to disclose the affiants' family connections to Garcia. Now that the relationships are clear, however, they do not warrant a different conclusion about Garcia's claim of actual innocence. Even without these affidavits, Garcia's alibi is supported by ample documentary evidence and other witnesses' live testimony, which Judge Fox found credible.

2.    *Denor's Identification of Garcia's Co-defendant*

Respondent next argues that other evidence at the hearing undermines the claim of actual innocence. He points to the fact that Denor identified at the lineup not only Garcia but also his co-defendant, a fellow drug dealer from the same block in the Bronx. Respondent argues that "it would be an amazing coincidence for Ms. Denor to have independently identified two acquaintances if they had not in fact acted in concert in murdering Mr. Vasquez."[67] Without knowing the identities of the other men in the lineup, however, no such inference is warranted. It is possible, for example, that they all were acquainted drug dealers from the Bronx, the "usual suspects," so to speak. If so, Denor's identification would have been unremarkable. That Denor identified the co-defendant therefore does not dispel doubts about her inconsistent testimony or require rejection of Garcia's claim of actual innocence.

3.    *Evidence of Motive*

Finally, respondent points to the new evidence that Garcia had a motive to kill

---

[67]

Resp. Br. 22.

Vasquez. The evidence, however, does not undermine the strong evidence that Garcia was in the

Dominican Republic on the night of July 16, 1991. Indeed, the fact that Garcia was connected to

Vasquez is an important part of his alibi. Several witnesses testified that Encarnacion awakened

Garcia in Matanzas on the night of July 16 to tell him about Vasquez's death and that Garcia went

to Encarnacion's house and spoke to Griselda Vasquez by telephone. Moreover, this testimony tends

to corroborate Ms. Vasquez's trial testimony that Garcia was in the Dominican Republic when she

spoke to him that night. The existence of a motive therefore goes some way towards supporting the

prosecution's case, but it does not go far enough to warrant any change in the conclusion that Garcia

made out a credible claim of actual innocence.[68]


B.      *Ineffective Assistance*

    1.      *Deficient Performance*

        To prevail on a claim of ineffective assistance of counsel, a petitioner must show a

deficiency in trial counsel's performance as well as prejudice. To establish deficiency, the petitioner

---

[68]

       In order to make out a credible claim of actual innocence, a petitioner must present reliable
evidence that was not presented at trial and show "that it is more likely than not that no
reasonable juror would have found him guilty beyond a reasonable doubt" if presented with
all of the evidence. *Garcia II*, 334 F. Supp. 2d at 452. This standard first was announced
in *Schlup v. Delo*, 513 U.S. 298, 327 (1995), and recently was reaffirmed in *House v. Bell*,
__ U.S. __, 126 S. Ct. 2064, 2076 (2006) (applying *Schlup* standard where petition was
barred because of procedural default in state court); *see also id.* at 2078 (rejecting argument
that "clear and convincing evidence" standard of 28 U.S.C. § 2244(b) replaced the *Schlup*
standard in cases in which petitioner has not filed a second or subsequent federal habeas
petition). The Court is not persuaded that a reasonable would have convicted, even if it (1)
discredited the testimony of Isabel Batista and Leonora and Cristian Filpo, (2) heard the
prosecution's theory of motive and (3) was told of Denor's identification of the co-
defendant. The testimony of Ortega and Encarnacion, and the airline ticket, unused
boarding pass, and police records, probably would have raised a reasonable doubt in the
mind of any juror.

must show that counsel's representation fell below an objective standard of reasonableness. That is, he must identify acts or omissions of counsel that were not results of reasonable professional judgment.[69]

Representation of a criminal defendant entails certain basic duties,[70] one of which is to investigate the facts of the case so that counsel can prepare a reasonably informed defense.[71] Counsel breaches this duty by failing "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[72] "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[73] In assessing the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[74]

---

[69]

See *Strickland v. Washington*, 466 U.S. 668 (1984).

[70]

*Id.* at 688.

[71]

*See, e.g.*, A.B.A. STANDARDS FOR CRIMINAL JUSTICE, Standard 4-4.1(a) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.").

[72]

*Strickland*, 466 U.S. at 691 (discussing counsel's duty to investigate mitigating facts in a capital case).

[73]

*Id.*

[74]

*Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (evaluating counsel's failure to investigate mitigating facts in a capital case).

### a.    Failure to Offer Documents

Judge Fox found Guttlein's performance ineffective in part because he did not offer the documents he possessed in evidence. While Guttlein raised the issue of the admissibility of the Alibi Notice Documents, he neglected entirely to conduct legal research and submit a brief as the trial court asked. He failed to offer either the Alibi Notice Documents or the Dominican Police Documents, and the trial judge never was given the opportunity to rule on their admissibility.[75]

Respondent argues that this was not unreasonable because the documents Guttlein possessed were inadmissible, and no amount of legal research would have revealed otherwise.[76] Researching and briefing the issue of admissibility, according to respondent, would have distracted Guttlein from pursuing more worthy defenses. This argument is erroneous.

### (1)    Relevance

Both the Alibi Notice Documents and Dominican Police Documents were relevant, as they strongly suggested Garcia's innocence of the charged crime, particularly in conjunction with Ms. Vasquez's trial testimony.

---

[75]

Judge Fox interpreted Guttlein's second colloquy with the trial court about the admissibility of the Alibi Notice Documents, Trial 71-86, as a failed attempt to offer those documents in evidence. He concluded that Guttlein was ineffective in failing to submit a brief and offer the documents a second time. *See* Report and Recommendation 39. This Court's reading of the transcript, however, is that at no point during that colloquy or at any other time did Guttlein actually offer into evidence either the Alibi Notice Documents or the Dominican Police Documents.

[76]

Resp. Br. 6-8. It is unclear whether respondent, in making this argument, refers only to the Alibi Notice Documents, or to the Dominican Police Documents as well. The difference is immaterial. As will become clear, all of the documents likely were admissible.

*(2)     Hearsay Exceptions*

The documents also probably were admissible under the public records exception to the hearsay rule.

In New York, a public record is an exception to the hearsay rule both under CPLR § 4520 and the common law.[77] Properly authenticated foreign official documents fall within this exception.[78]

In order to be admissible under Section 4520, a document must be (1) made by a public officer, (2) in the form of a certificate, (3) authorized by special provision of law, (4) prepared in the course of the officer's official duty, (5) a memorialization of a fact ascertained or an act performed by the public officer, and (6) on file or deposit in the public office.[79] At common law, an official record is admissible "when a public officer is required or authorized, by statute or nature of the duty of the office, to keep records of acts or transactions occurring in the course of his official

---

[77]

See, e.g., *Consol. Midland Corp. v. Columbia Pharm. Corp.* 42 A.D.2d 601, 601, 345 N.Y.S.2d 105, 106 (2d Dep't 1973) (documents not admissible under § 4520 nevertheless may be admissible under the broader common law public records exception).

[78]

See *Matter of Will of Eggers*, 122 Misc. 2d 793, 471 N.Y.S.2d 570, (Surr. Ct. Nassau Co. 1984) (admitting authenticated Czech birth, marriage, and death certificates); *In re Magre's Estate*, 189 Misc. 246, 249, 73 N.Y.S.2d 467, 469 (Surr. Ct. N.Y. Co. 1947) ("a properly authenticated certificate of the presumptive death of the decedent [issued by the French Government] was received in evidence."); *accord FAA v. Landy*, 705 F.2d 624, 633 (2d Cir. 1983) (FED. R. EVID. 803(8) applies to foreign documents); *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976) (same); *Touche Ross Ltd. v. Filipek*, 7 Haw. App. 473, 486, 778 P.2d 721, 730 (1989) (no territorial restriction imposed by Hawaii's public record rule).

[79]

*People v. Michaels*, 174 Misc. 2d 982, 984, 667 N.Y.S.2d 646, 648 (N.Y. Crim. Ct. Richmond Co. 1997).

duty."[80]

   The record does not indicate whether each of the foundational requirements for admission under either Section 4520 or the common law were met. Respondents, however, do not rely on any lack of foundation in making their objection. Moreover, the issue on *Strickland*'s first prong is not whether Guttlein had the evidence to lay a foundation, but whether a reasonable lawyer would have made an effort to obtain it. A reasonable lawyer at least would have attempted to meet the unexacting requirements of the common law by, for example, researching Dominican law,[81] calling an expert on Dominican law enforcement,[82] or calling a Dominican police officer or lawyer to testify to the nature of the duties of the documents' authors.[83] The critical point is that there was and is every reason to conclude that the proper foundation could have been laid, even assuming that respondent had raised the point.[84] Moreover, anyone familiar with the welter of official reports

---

[80]  *Id*.

[81]  *See id.* (finding proper foundation by taking judicial notice of New York statutes)

[82]  *Cf.* PRINCE, RICHARDSON ON EVIDENCE § 8-306 (11th ed. 1995) (use of expert testimony to lay the foundation for the business record hearsay exception may be permitted)

[83]  *Michaels*, 174 Misc. 2d at 984, 667 N.Y.S.2d at 648 (public documents admissible "when a public officer is required or authorized, by statute *or nature of the duty of the office*, to keep records of acts or transactions occurring in the course of his official duty") (emphasis added).

[84]  If the foundational elements for the public records exception could not have been met, Guttlein might have succeeded in offering the documents as business records.

  In New York, a business record is within an exception to the hearsay rule under CPLR § 4518, which was enacted to overcome what were seen as deficient and overly technical common law rules. *See People v. Kennedy*, 68 N.Y.2d 569, 510 N.Y.S.2d 853, 503 N.E.2d 501 (1986); PRINCE, RICHARDSON ON EVIDENCE § 8-301.

In order to be admissible under § 4518, a document must have been made (1) in the regular course of business—reflecting a routine, regularly conducted business activity, needed and relied on in the performance of the functions of the business, (2) pursuant to established procedures for the routine, habitual, systematic making of such a record, and (3) at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. *E.g.*, *People v. Cratsley*, 86 N.Y.2d 81, 89, 629 N.Y.S.2d 992, 996, 653 N.E.2d 1162, 1166 (1995) (citing *Kennedy*, 68 N.Y.2d 569, 510 N.Y.S.2d 853, 503 N.E.2d 501). Section 4518 defines "business" broadly to include  "a business, profession, occupation and calling of every kind," N.Y. CPLR § 4518(a), and likely would apply to documents created and kept by foreign law enforcement agencies.

While the preferred method of laying a foundation for a business record is to provide testimony of an individual with personal knowledge of the record-keeping practices of the subject business, *see, e.g.*, *Dayanim v. Unis*, 171 A.D.2d 579, 580, 567 N.Y.S.2d 673, 674 (1st Dep't 1991), "[t]he absence of specific statutory identification of who is a competent witness leaves room for the argument that the foundation requirements may, in a proper case, be provided by" other forms of evidence, such as expert testimony. PRINCE, RICHARDSON ON EVIDENCE § 8-306 (expert testimony not foreclosed); *cf. Kennedy*, 68 N.Y.2d 569, 580, 510 N.Y.S.2d 853, 860, 503 N.E.2d 501, 508 (declining to decide whether expert testimony ever would suffice to lay a foundation for the business records exception, and holding that documents should not have been admitted where expert's testimony failed to establish that it was the regular course of the subject business to make the records in question).

As with the public records exception, Guttlein likely could have met the foundational requirements of § 4518 by calling a Dominican police officer or an expert in Dominican law enforcement who was familiar with the kinds of documents usually produced when an individual is arrested in the Dominican Republic. In view of this, it is unnecessary to discuss the common law exceptions that might have been relied upon.

Finally, if the documents were not admissible as business records, Guttlein still might have argued they were admissible under a "constitutionally-based exception to the hearsay prohibition for certain evidence offered by defendants in criminal cases." *Morales v. Portuondo*, 154 F. Supp. 2d 706, 724-25 (S.D.N.Y. 2001) (citing New York cases). The New York courts have recognized that, in certain circumstances, the right to a fair trial is compromised when reliable evidence that is essential to putting on a defense is excluded because it does not meet all of the technical requirements of a hearsay exception. *See People v. Esteves*, 152 A.D.2d 406, 414, 549 N.Y.S.2d 30, 35 (2d Dep't 1989) ("in certain instances, an exculpatory hearsay statement which does not fall within the specified categories of hearsay exceptions may be admissible *provided the statement is critical to the defense and is otherwise reliable and trustworthy*") (emphasis in original); *see also People v. Robinson*, 89 N.Y.2d 648, 657 N.Y.S.2d 575, 679 N.E.2d 1055 (1997) (allowing defendant, on constitutional principles, to introduce grand jury testimony of unavailable witness, even though testimony did not fall within recognized hearsay exception); *People v. James*, 242 A.D.2d 389, 661 N.Y.S.2d 273 (2d Dep't 1997) (same). Guttlein easily could have established that the documents were critical to Garcia's defense. In addition, he

26

constantly created by New York and federal officers and agents—UF-61's, DD-5's, 302's, and the like—knows that such reporting is inherent in the law enforcement function and that this likely is so in the Dominican Republic as well.

### (3)    Authentication

Respondent argues, however, that if the documents had been offered as public records, they would have been inadmissible anyway because they were not properly authenticated under CPLR § 4542.[85]

Putting aside whether the documents satisfied Section 4542,[86] respondent ignores the

---

[85]    could have called Ortega's stepfather, who obtained the records from the Dominican Republic, to testify that they had come from a public office in the Dominican Republic. *See* Judge Fox Hearing 248-52. This probably would have been sufficient to establish that the documents were reliable, thus making them admissible under the residual hearsay exception.

The statute provides that a copy of a foreign official record is self-authenticating if two requirements are met: (1) the copy is attested by an authorized official, and (2) a "final certification" is made with respect to the genuineness of the signature and official position either of (a) the person who attested the copy or (b) of any other foreign official who made a certification concerning the attestation. *See* N.Y. CPLR § 4542(a). Further, "[a] final certification may be made by a secretary of an embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States." *Id.* § 4542(b).

[86]    It is not clear that the Alibi Notice Documents in fact failed to meet § 4542's requirements. Those documents included a bail document, a certification by a Dominican official, and a certification of the certification by a the United States Embassy. If the certifications themselves were admissible, the bail document might have been self-authenticating under § 4542.

In any event, even if some or all of the documents did not have the proper attestations and certifications under § 4542, Guttlein was ineffective in failing to obtain them. And even if he were unable to obtain final certifications, he might still have succeeded in authenticating the documents. Section 4542(b) authorizes a court to admit an attested copy of a foreign public record without final certification "[i]f reasonable opportunity has been given to all

27

fact that Section 4542's requirements are not mandatory. The statute provides that a foreign official record "*may* be evidenced" in the ways there described.[87] It does not say "shall." Moreover, Section 4543 provides that "[n]othing in this article prevents the proof of a fact or a writing by any method authorized by any applicable statute or by the rules of evidence at common law."[88] Other means of authentication are permitted.[89]

Under the common law, all Guttlein had to do was offer evidence from which a reasonable juror could have concluded that the documents were what they purported to be.[90] No more

---

parties to investigate the authenticity and accuracy of the documents," and "good cause [is] shown." *Id.* § 4542(b); *see also Estate of Birsten*, 104 Misc. 2d 345, 346-47 (Surr. Ct. N.Y. Co. 1980) (admitting official Polish documents without final certification where practicing Polish attorney stated in affidavit that at the time the questioned documents were issued the attesting officials were the officials they purported to be and that their signatures and official seals were genuine).

[87]

N.Y. CPLR § 4542 (emphasis added).

[88]

*Id.* § 4543.

[89]

*See* PRINCE, RICHARDSON ON EVIDENCE § 9-207 ("any document is still provable according to the rules of common law, thereby making it clear that the modes provided for by statute are not exclusive); EDITH FISCH, FISCH ON NEW YORK EVIDENCE § 118 (2d ed. 1977, 4th prtg. 1989) ("because [§ 4542] is permissive, the public records of a foreign country may also be proved by the rules of common law or by any other competent proof.").

[90]

Authenticity of evidence is a matter of conditional relevance. That is, evidence is not relevant if it is not what it purports to be. *See, e.g.*, *People v. Garneau*, 120 A.D.2d 112, 116, 507 N.Y.S.2d 931, 935 (4th Dep't 1986) ("to be admissible, any public document must be authenticated as being that which it purports to be.") (citing *People v. Franklin*, 14 A.D.2d 985, 222 N.Y.S.2d 173 (4th Dep't 1961); PRINCE, RICHARDSON ON EVIDENCE § 9-101 (a writing is not relevant unless sufficient evidence has been introduced to support a finding that it was made, signed, or adopted by a particular person); *id.* § 9-201 ("Before a public document can be received in evidence, it must be shown that the document is what it purports to be.); *accord United States v. Sliker*, 751 F.2d 477, 497 (2d Cir. 1984) ("In order for a piece of evidence to be of probative value, there must be proof that it is what its proponent says it is.").

would have been required than the testimony by a person with personal knowledge that the

documents were obtained from an official in the Dominican Republic.[91]

---

To authenticate a piece of evidence, the proponent must lay a foundation sufficient to support a finding by the jury that the item is what it purports to be. *See People v. Lynes*, 49 N.Y.2d 286, 291, 425 N.Y.S.2d 295, 297 (1980) (authentication of voice in sound recording requires foundation sufficient to support a jury finding that the voice belongs to purported speaker); PROPOSED NEW YORK EVIDENCE CODE (1980) § 104(b) ("Preliminary questions as to the relevance of offered evidence shall be determined by the court. When the relevance of the offered evidence depends upon the fulfillment of a condition of fact, the court shall admit it after, or may admit it subject to, introduction of evidence sufficient to support a finding of the fulfillment of the condition.").

[91]

Any competent evidence probative of the fact that the documents were from a Dominican law enforcement agency likely would have sufficed. Upon hearing testimony that one of Garcia's friends or relatives retrieved the documents from a Dominican official in a public office where such documents are kept, a reasonable juror could have concluded that the documents were authentic. *See* PROPOSED NEW YORK EVIDENCE CODE (1980) § 901(b)(7) (providing nonexhaustive list of authentication methods, including the presentation of "[e]vidence that a . . . purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept"); *id.* cmt. § 901(b)(7) (recognizing "the common-law rule that documents identified by their custodian as coming from official custody are prima facie authentic," and that "[p]roper custody can be shown by the testimony of . . . any person with knowledge . . . or by other proof sufficient to support a finding that the material is from the proper office"); 2 MCCORMICK ON EVIDENCE § 226 (6th ed. 2006) ("If a writing is claimed to be an official report or record of a public governmental agency, and is also proved to have come from the proper public office where such official papers are kept, it is generally agreed that this authenticates the offered document as genuine"); PRINCE, RICHARDSON ON EVIDENCE § 9-101 ("Proof that the document was taken from the proper official custody may be sufficient."); 7 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2158 (James H. Chadbourn rev. 1978) (private person may testify from personal knowledge that a public record was in official custody when examined or copied) (citing *Adamthwaite v. Synge*, 4 Camp. 372, 1 Stark. 183, 184 (1816) ("If the witness had stated that the record came out of the hands of the proper officer, it would have been sufficient [to prove custody].")); *accord, e.g.*, FED. R. EVID. 901(b)(7) (providing nonexhaustive list of authentication methods, including the presentation of "[e]vidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept"); *State v. Miller*, 79 N.M. 117, 119, 440 P.2d 792, 794 (1968) (admitting files from the international depository for fingerprints in Washington, D.C., where agents testified that they took the files from that office); *City of Columbus v. Ogletree*, 29 S.E. 749 (Ga. 1897) ("A book purporting to contain the official minutes of a city council . . . was admissible in evidence upon proof showing that the book in question had been brought from the clerk's

Such testimony most likely could have been obtained. Ortega testified at the hearing before Judge Fox that she received both the Alibi Notice Documents and the Dominican Police Documents from her stepfather, who traveled to the Dominican Republic before trial. Before he left, Ortega said, she gave him the details of Garcia's July 15-16 incarceration and asked him to get documents related to the case from the Puerto Plata courthouse. When Ortega's stepfather returned to the United States, he gave Ortega the Alibi Notice Documents and Dominican Police Documents, which Ortega then gave to Guttlein. Ortega testified also that she told Guttlein how she had obtained the documents and that her stepfather was in the United States at that time.[92] Guttlein therefore could have authenticated the documents by calling Ortega's stepfather as a witness and having him describe how he obtained the documents from the Puerto Plata courthouse.[93]

---

office by the city treasurer."); *cf. United States v. Hernandez-Herrera*, 952 F.2d 342 (10th Cir. 1991) (permitting the use of almost any probative evidence to authenticate a public record).

The same method of authentication would have sufficed if some or all of the documents were offered as business records instead of public records. Testimony of a witness that he or she retrieved documents from the business that created them certainly would have permitted a reasonable juror to conclude that the documents were authentic. *See, e.g.*, *People v. Brown-Fort*, 13 A.D.3d 731, 732, 786 N.Y.S.2d 233, 234 (3d Dep't 2004) (testimony that piece of evidence was the substance given to witness by the defendant was sufficient to admit it).

This is not to say with certainty that any of the documents would have been admitted. It is to say, however, that upon the presentation of proper foundation evidence, it was probable that the trial court would have admitted the documents. Guttlein was unreasonable in not offering the documents at all and therefore not giving the trial judge any opportunity to rule on their admissibility.

[92]   Judge Fox Hearing 248-52.

[93]   Even if Ortega's stepfather somehow were unavailable, Ortega's testimony itself may have sufficed. "Circumstantial evidence may satisfy the requirement that a writing be authenticated before it may be introduced." *People v. Jean-Louis*, 272 A.D.2d 626, 627, 709 N.Y.S.2d 101, 102 (2d Dep't 2000) (citing *People v. Dunbar Contracting Co.*, 215

Minimal research therefore would have revealed that the documents likely were admissible. Guttlein's failure to research and brief the issue therefore fell well below objective standards of reasonableness.

> b.    *Failure to Investigate*

At the time of trial, Guttlein possessed documents indicating that Garcia was in the Dominican Republic on the day of the murder. He knew of several witnesses who reportedly were prepared to testify that they were with Garcia in the Dominican Republic that day. Any reasonable defense attorney in Guttlein's position certainly would have undertaken *some* investigation into the defendant's whereabouts at the time of the crime. Yet Guttlein did not. He made no effort to obtain additional documentary evidence of Garcia's arrest on July 15, 1991. Nor did he seek to obtain documents pertaining to Garcia's travels (or attempted travels) to and from the Dominican Republic in June and July 1991. He failed also to interview prospective alibi witnesses or investigate physical evidence that could have been used to corroborate their testimony.

Respondent argues that Guttlein should not be faulted for having failed to interview alibi witnesses because he did not know any who could have placed Garcia in the Dominican Republic at the exact time of the murder. This is irrelevant. After learning that his client was in the Dominican Republic only hours before the crime was committed, Guttlein should have investigated where Garcia went next. His duty was to investigate, not to make do with whatever evidence fell into

---

N.Y. 416, 109 N.E. 554 (1915)). Ortega's testimony that she asked her stepfather to retrieve documents from the Dominican Republic and that he returned with what purported to be official records may have been sufficient to support a finding that the documents indeed were in the possession of a public official in the Dominican Republic when retrieved.

his lap.[94] Had Guttlein interviewed Ortega, for example, he would have learned that others saw Garcia in the Dominican Republic on the night of July 16, 1991.

In failing to conduct any investigation at all, Guttlein's performance at trial fell well below objective standards of reasonable representation.

### c.    *Trial Strategy*

The Supreme Court has cautioned that a court must "apply[] a heavy measure of deference to counsel's judgments"[95] in ineffectiveness cases. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[96] Thus, a court should be reluctant to disturb the portion of counsel's performance that is related to "trial strategy," or decisions to pursue particular lines of defense when several alternatives were available.[97]

---

[94]
   *See Wiggins*, 539 U.S. at 527 ("a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

[95]
   *Strickland*, 466 U.S. at 691.

[96]
   *Id.* at 690-91.

[97]
   *See Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001).

*(1)      Strength of Documentary Evidence*

Guttlein stated in his affidavit that he did not recall precisely why he did not investigate Garcia's alibi.[98] He speculated that he believed a full investigation was unnecessary because the documents he submitted to the trial court would have established Garcia's innocence with such certainty that the trial judge would have dismissed the case.[99]

This does not excuse Guttlein's performance. Indeed, it exemplifies its inadequacy. If, as Guttlein stated, "he was surprised and dismayed when the trial judge indicated . . . that he was not inclined to admit the Dominican Documents into evidence,"[100] then he should have briefed the issue of admissibility and attempted to persuade the court to admit the evidence he thought was essential to Guttlein's defense. Moreover, he should have presented evidence he knew would have been admissible, such as the testimony of Ana Ortega and other alibi witnesses.

*(2)      Weakness of the Prosecution's Case*

Guttlein speculated also that his failure to investigate stemmed from his belief that the prosecution's case was weak.[101] This, however, would have been no excuse. No matter how weak the prosecution's case, proof that Garcia had been in the Dominican Republic at the time of the murder was central to the truth-finding function of the trial. A perceived paucity of evidence on the

---

[98]     Guttlein Aff. ¶ 8.

[99]     *Id.* ¶ 5.

[100]    *Id* ¶ 6.

[101]    *Id.* ¶ 8.

prosecution's side did not absolve Guttlein of the duty to present facts that, if credited, would have been conclusive in his client's favor. But even this perhaps is beside the point.

As the Second Circuit has held, a decision not to prepare an adequate defense because a defense lawyer thinks the prosecution's case is weak is not "strategic." It is motivated by the desire to avoid work, not to serve the best interests of the defendant.[102] "No lawyer could make a 'strategic' decision not to interview witnesses thoroughly, because such preparation is necessary in order to know whether the testimony they could provide would help or hinder his client's case, and thus is prerequisite to making any strategic decisions at all."[103] Thus, as Judge Fox correctly concluded, "[t]here is no reasonable trial strategy that would have excluded at least conducting interviews of the alibi witnesses to determine whether they could provide exculpatory evidence."[104]

### (3)    Cost and Time Constraints

Finally, Guttlein speculated that cost and time constraints were potential factors leading to his failure to investigate.[105]

---

[102]

See *Pavel*, 261 F.3d at 218 (finding ineffective assistance where counsel called only the defendant and no other witnesses because he believed that the court would grant his motion to dismiss).

[103]

*Newton v. Coombe*, No. 95 Civ. 9437 (GEL), 2001 WL 799846, *5 (S.D.N.Y. July 13, 2001) (discussing whether counsel's performance was deficient where he called two alibi witnesses to the stand who gave conflicting testimony, but declining to find deficiency because record did not indicate why witnesses had conflicting testimony).

[104]

Report and Recommendation 21.

[105]

Guttlein Aff. ¶ 8.

Deciding that investigation is costly is not, as *Strickland* requires, equivalent to a reasonable and informed decision that investigation is unnecessary. Indeed, as one court has held,

> "There are costs involved whenever defense counsel is obliged to undertake an investigation. These costs are often substantial. . . . [However, h]aving accepted the responsibility of representing a criminal defendant, counsel owes a duty to his client that will on occasion require him to make financial outlays that might be considered unfair for an ordinary businessman who, unlike a licensed attorney, has not voluntarily adopted an enhanced ethical obligation to society."[106]

If Guttlein believed that his retainer[107] alone would not have made traveling to the Dominican Republic to retrieve police records financially feasible, he could have petitioned the trial court for public assistance.[108] And even if the court denied his request, Guttlein could have undertaken less costly investigative measures, such as interviewing the witnesses who were prepared to corroborate Garcia's alibi and subpoenaing airlines and travel agencies to obtain flight records and plane manifests, as well as telephone companies to retrieve call records.

Nor was Guttlein excused from investigating because of time constraints. A decision not to pursue a particular defense is "strategic" if it involves a careful calculation that time would be spent better pursuing other defenses. Guttlein made no such decision here. He failed to investigate the alibi entirely and so could not have decided that another defense was more worthy of his time.

---

[106]

*Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 111 (E.D.N.Y. 2003) (finding ineffective assistance where counsel failed to conduct investigation of crime scene to determine if witness testimony was credible).

[107]

*See* Pet. Exs. 7, 8.

[108]

A New York court is authorized to order reimbursement for the costs of investigative services upon a showing that such services are necessary to an adequate defense and that a criminal defendant "is financially unable to obtain." N.Y. COUNTY LAW § 722-c (McKinney 2004).

This is not to say that Guttlein was unreasonable in pursuing the defense he did—attacking Denor's credibility. It is to say that this was not enough. "[S]trategic choices *made after less than complete investigation* are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[109] Guttlein could not have made a strategic decision not to present the alibi because he did not then know the details of such a defense or how credible it would have been.[110]

Judge Fox therefore was correct in concluding that "counsel's performance did not meet the *Strickland* standard for effective assistance of counsel."[111]

2.      *Prejudice*

To establish prejudice, a petitioner must show that there is a reasonable probability that the verdict would have been different but for counsel's unprofessional errors.[112] In making the prejudice determination, a court

> "must consider the totality of the evidence before the judge or jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is

---

[109]

    *Strickland*, 466 U.S. at 690-91 (emphasis added).

[110]

    Respondent argues that Guttlein was strategic in not calling Ortega to the stand because she was an interested witness and would not have been believed. Ortega's interest in the case, however, does not excuse Guttlein's failure to interview her, which would have revealed that less interested witnesses were available to testify.

[111]

    Report and Recommendation 46.

[112]

    *Strickland*, 466 U.S. at 694.

more likely to have been affected by errors than one with overwhelming record support."[113]

The jury heard virtually nothing about the alibi defense. It saw no documentary evidence about Garcia's travel to the Dominican Republic or his incarceration there. It heard no testimony from the numerous witnesses who would have placed Garcia in the Dominican Republic before, during, and after the murder. Nor did it hear from the witnesses who could have corroborated Griselda Vasquez's testimony that Garcia spoke to her from the Dominican Republic on the night of July 16, 1991.

Evidently, the jury convicted primarily on the basis of Denor's testimony and lineup identification of Garcia. Given, however, that Denor admitted she was on Valium at the time of the murder and Thorazine during the trial, as well as the fact that her testimony was rife with inconsistencies, the prosecution's case was not, to say the least, particularly strong. There is thus little doubt that the alibi evidence, had it been produced at trial, would have altered the landscape substantially. The decision of a jury that did not weigh this evidence is not reliable. Respondent nevertheless objects to Judge Fox's finding of prejudice for three reasons.

a.    *Admissibility of Documents*

Respondent argues first that Guttlein's failure to submit documentary evidence of the alibi did not prejudice Garcia because the documents were not admissible. As noted, this argument is erroneous—the documents almost certainly were admissible, and Guttlein could have discovered

---

[113]    *Id.* at 697-98.

this with ease.[114] Moreover, respondent's argument overlooks the fact that numerous alibi witnesses could have testified to Garcia's alibi and that Garcia's current counsel has uncovered additional admissible evidence. This evidence alone had a reasonable probability of changing the outcome of the case. Even if the documents Guttlein possessed were inadmissible, Guttlein still failed to investigate and present evidence that *was* admissible.

       b.    *Alibi Imperfections*

Respondent next argues that Garcia was not prejudiced because his alibi was imperfect. That is, if Guttlein had presented the alibi evidence he possessed at trial, the jury would have been "made aware that [Garcia] was released in time to murder Vasquez."[115]

This argument is unavailing. If Guttlein had investigated Garcia's alibi as a reasonable lawyer would have done, he would have uncovered much more evidence to bolster the alibi, including testimony that placed Garcia in the Dominican Republic at the time of the murder.

Furthermore, as Judge Fox noted, respondent's theory that Garcia flew to New York immediately after his release from jail makes little sense. On this theory, Garcia was arrested for traveling with false documents on July 15, 1991, incarcerated until July 16, obtained new false papers that same day, and then used them to pass through the same guards at the same airport

---

[114]

        Additionally, by failing even to offer the documents in evidence, Guttlein never gave the trial court the opportunity to rule on their admissibility and so did not preserve the issue for appeal.

[115]

        Resp. Br. 9.

checkpoint who had arrested him only one day earlier.[116] Respondent's claim that a reasonable jury necessarily would have convicted on this theory is highly doubtful.

To claim that Garcia was not prejudiced because his alibi was imperfect is to urge an unreasonable application of the *Strickland* standard. Garcia need not prove with certainty that he would have secured an acquittal. He must show only that there was a strong probability that the verdict would have been different. Given the weakness of the prosecution's case, the arguable implausibility of its theory, and the evidence supporting the alibi, Judge Fox concluded that Garcia satisfied this burden. This Court agrees entirely.

### c.    Fabrication

Finally, respondent contends that Garcia's alibi is recently fabricated and that Judge Fox improperly "assumes the truth of the late-coming and frequently evolving allegations made by petitioner and his wife Ortega."[117]

### (1)    Post-Conviction Proceedings

Respondent argues that Garcia's alibi evidence is untrustworthy because it has come to light only now, after years of post-conviction proceedings.

He points first to the fact that the file of Garcia's appellate counsel did not contain information about the names of alibi witnesses, and argues that this indicates that the witnesses who

---

[116]    Report and Recommendation 43 n.6.

[117]    Resp. Br. 9.

39

testified at the hearing before Judge Fox cannot be believed. Nothing in appellate counsel's file,

however, indicates that appellate counsel specifically requested the names of individuals who could

place Garcia in the Dominican Republic on the night of the murder.[118] Moreover, appellate counsel

testified that he did not interview Ortega, who might have provided the names of alibi witnesses if

asked.[119] Garcia therefore may not have supplied the names of alibi witnesses because he was not

asked to do so.

        Respondent argues also that if the alibi witnesses were credible, Garcia would have

mentioned them in the *pro se* supplemental brief he filed in connection with his appeal[120] and his *pro*

---

[118]

        Appellate counsel's file contained two letters mentioning the alibi. The first was Garcia's letter to appellate counsel, dated June 15, 1993, in which Garcia dedicated almost an entire page to describing his alibi, the documents provided to Guttlein, and Guttlein's failure to present any alibi evidence at trial. *See* Resp. Ex. I at 31-33. The second was appellate counsel's letter to Garcia, dated January 3, 1995, in which he asked if Garcia had "any evidence regarding the time [he was] released," or information about his post-release travels. *See id.* at 16-17.

        While appellate counsel prompted Garcia to provide information about his whereabouts post-release, he did not specifically request information about alibi witnesses. Indeed, his letter appears to have been a request for more documentary evidence. Garcia therefore may not have thought to provide the names of individuals who could provide exculpatory testimony.

        At the hearing, Garcia produced a letter, dated January 20, 1995, addressed to appellate counsel, in which he stated that Ortega could provide the names of individuals who would place Garcia in the Dominican Republic on the night of the murder. Pet. Exs. 26, 27. Respondent argues that because this letter was not in appellate counsel's file, and because appellate counsel denied ever receiving it, *see* Judge Fox Reopened Hearing 27-28, it must have been fabricated. Any number of theories other than fabrication, however, might explain these circumstances. Absent more convincing proof that it was written recently, a conclusion that the letter was fabricated is not warranted.

[119]

        Both Ortega and Guttlein stated that, at the time of trial, Ortega could have produced the names of alibi witnesses. Judge Fox Hearing 247; Guttlein Aff. ¶ 9.

[120]

        Pet. Mem. Supp. Pet. Habeas Corpus Ex. 1.

40

*se* application for a writ of error *coram nobis* on the ground of ineffective assistance of appellate counsel.[121] However, Garcia's failure to mention the alibi witnesses in *pro se* post-conviction papers does not necessarily say anything about the credibility of his alibi. It may say more about his lack of legal training and knowledge of his rights.[122]

### (2)    *Guttlein's Limited Knowledge of Alibi Evidence*

Respondent next points to the fact that Guttlein was unaware of alibi witnesses who could have placed Garcia in the Dominican Republic at the exact time of the murder. This, he argues, shows that the alibi was invented recently.

In fact, it shows no such thing. Rather, it highlights Guttlein's ineffectiveness. If he had done his job, Guttlein would have known of numerous alibi witnesses who could have placed Garcia in the Dominican Republic on the night of the July 16, 1991.

Indeed, it is not surprising that much of Garcia's alibi evidence has come to light recently. It was not until now that Garcia had counsel willing to interview Ortega extensively, follow leads to other witnesses, and travel to the Dominican Republic to obtain official records. That Guttlein was unaware of the strength of the alibi reinforces Garcia's claim. It does not undermine it.

---

[121]

*See* Resp. Mot. Dismiss Ex. 6.

[122]

Respondent asserts that Garcia is "well-versed" in the legal system. Resp. Br. 10. He does not produce any evidence to support this, however. Presumably, he means Garcia is experienced with criminal practice because he was tried and convicted and then filed some *pro se* motions. But this does not make someone well versed in criminal law. Formal legal education and training do.

(3)     *Witness Credibility*

Finally, respondent claims that the alibi witnesses are not credible and that the documentary evidence is not trustworthy. But he mistakes the function of the habeas court. It is not this Court's role to try the case. Rather, it is to determine whether Guttlein's failure to offer alibi evidence at trial, and thus to give the jury the opportunity to evaluate its trustworthiness, prejudiced Garcia's case.

To be sure, some assessment of credibility is essential in order to make this determination. A federal habeas court certainly is not obliged or entitled to assume that any proposed evidence offered up by petitioner, regardless of how obviously unreliable it might be, is sufficient to justify a conclusion that the petitioner was deprived of constitutional rights. But the evidence offered here is sufficiently credible to persuade this Court that there is a reasonable probability that the verdict in this case would have been different had the jury seen and heard it.

First, Judge Fox explicitly credited the testimony of Encarnacion, Burgos, and Leonora and Cristian Filpo, all of whom placed Garcia in the Dominican Republic on or around the night of the murder.[123] Indeed, contrary to respondent's contention, that the witnesses do not agree about every minor detail of events fifteen years old makes their testimony more credible, not less so.

Second, respondent's claim that the documentary evidence is or might be fabricated is, at best, perplexing. Nothing in the record supports any such conclusion. The District Attorney, with all of his resources, has conducted no forensic examination or otherwise come forward with any

---

[123]     *See* Report and Recommendation 46 (finding that these witnesses did not have motives to commit perjury).

42

evidence to support the claim.[124] And if the documents were fabricated, one wonders why Garcia did not do a better job in constructing his alibi. If Garcia forged these documents, he just as easily could have made his alibi airtight by creating travel documents in his own name and detention documents placing him in jail at the precise time of the murder.

In the last analysis, there is a reasonable probability that Garcia would have been acquitted if Guttlein had done his job competently. It will be up to a new trial jury, however, to make the final decision of guilt or innocence, assuming the People elect to retry petitioner.

---

[124]

*See* Hearing, Oct. 26, 2006 at 11.

C.      AEDPA

        Under 28 U.S.C. § 2254(d), a state prisoner's application for habeas corpus shall not

be granted with respect to any claim that was adjudicated on the merits in a state court proceeding

unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," or "resulted in

a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."[125]

        The Bronx County Supreme Court denied Garcia's motion to vacate in December

2000 in a one-paragraph, handwritten decision that stated simply "the evidence submitted does not

establish defendant's alibi. A review of the record fails to substantiate allegations of ineffective

assistance of counsel."[126] This was an unreasonable application of clearly established federal law

under AEDPA.[127]

        The state court applied an unreasonably strict standard in evaluating Garcia's claim.

To satisfy the second prong of *Strickland*, Garcia was not required to establish his alibi, as the state

court decision held, but only to show that trial counsel's performance fell below professional

---

[125]

        28 U.S.C. § 2254(d).

[126]

        Resp. Mot. Dismiss Ex. 13.

[127]

        The Court need not focus on 28 U.S.C. §2254(d)'s other ground for granting a habeas
        petition, that is, whether the state court's decision was an unreasonable determination of the
        facts. The Second Circuit has held that "when a state court fails to articulate the rationale
        underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the
        federal court will focus its review on whether the state court's ultimate decision was an
        'unreasonable application' of clearly established Supreme Court precedent." *Eze v.
        Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (quoting *Sellan v. Kuhlman*, 261 F.3d
        303, 311-12 (2d Cir. 2001).

standards of competence and that the outcome of the case probably would have been different but for this deficiency.

This Court recognizes that the foregoing discussion of Garcia's ineffective assistance claim is based partly on evidence that was not before the state court when it decided Garcia's motion to vacate. Nevertheless, the evidence before the state court was more than sufficient to make out a claim of ineffective assistance under *Strickland.*

Garcia submitted with his motion to vacate, *inter alia*, affidavits of five alibi witnesses,[128] the Dominican Police Documents,[129] and all but one of the Alibi Notice Documents.[130] The state court had also the trial transcript, which revealed that Guttlein submitted the amended alibi notice, possessed exculpatory documents, failed to offer the documents in evidence, failed to brief the issue of the documents' admissibility as the trial court asked, and failed to call alibi witnesses who could have corroborated the testimony of Griselda Vasquez.

Accordingly, measured against the record before the state court judge, Garcia is entitled to relief.

---

[128]

       *See* Pet. Mot. Vacate Exs. A1-3 (Encarnacion), B1-3 (Leonora Filpo), C1-C3 (Cristian Filpo), D1-3 (Isabel Batista), E1-2 (Ortega).

[129]

       *See* Pet. Mot. Vacate Exs. H2.1-2.2 ("Informative Note," dated July 15, 1991); H3.1-H3.2 (Memorandum from Forgery Investigation Officer to Legal Counsel of the Department of Puerto Plata, dated July 16, 1991); H3.5-H3.6 (Memorandum from Assistant Legal Counsel to Magistrate District Attorney, dated July 16, 1991); H3.3-3.4 (certification by Assistant Legal Counsel of the Puerto Plata police).

[130]

       Pet. Mot. Vacate Exs. 3.7-3.9. The only document that appears not have been submitted to the state court is one of the certifications of the bail document.

D.      *Remedy*

　　　1.　　*Conditional Release*

　　　　　Federal courts have broad discretion in fashioning a remedy for unlawful incarceration.[131] They are authorized to "dispose of [a habeas petition] as law and justice require."[132]

　　　　　"The typical relief granted in federal habeas corpus is a conditional order of release,"[133] requiring the state either to release the prisoner from custody or retry him in a constitutional manner within a reasonable period of time.[134] In rare cases, however, a court may grant unconditional, immediate release.[135] Such a remedy is warranted when the constitutional violation is "so egregious, its consequences so grave, and the unlawful restraints already imposed on the petitioner's liberty so lengthy or severe that law and justice mandate unconditional discharge."[136]

---

[131]

　　　*See Hilton v. Braunskill*, 481 U.S. 770, 775 (1987).

[132]

　　　28 U.S.C. § 2243.

[133]

　　　*See Herrera v. Collins*, 506 U.S. 390, 403 (1993).

[134]

　　　*See Morales v. Portuondo*, 165 F. Supp. 2d 601, 608-09 (S.D.N.Y. 2001); 2 RANDY HERTZ & JAMES LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 33.3 (4th ed. 1998).

[135]

　　　*Morales*, 165 F. Supp. 2d at 608 ("Unconditional release, however, is a remedy rarely granted.") (citing *Cody v. Henderson*, 936 F.2d 715, 719 (2d Cir. 1991); *Simmons v. Reynolds*, 898 F.2d 865, 869 (2d Cir. 1990)).

[136]

　　　2 HERTZ & LIEBMAN § 33.3 & n.11 (citing cases). *See, e.g.*, *Kelly v. Roberts*, 998 F.2d 802, 809 n.11 (10th Cir. 1993) (granting immediate release where petitioner was incarcerated for ten years because prolonging incarceration to allow the state to file a rehearing was unjust); *Bowen v. Maryland*, 799 F.2d 593, 614 & n.12 (10th Cir. 1986) (ordering unconditional release where prosecution suppressed evidence strongly suggesting innocence); *LaFrance v. Bohlinger*, 487 F.2d 506, 507 (1st Cir. 1973) (granting an unconditional writ where "petitioner below had served much, possibly most, of his state

Garcia argues that immediate release is warranted because he has been imprisoned for over fifteen years and served nearly two-thirds of the minimum sentence for a crime that he may well have not committed. It would be unjust, he argues, to allow him to remain in prison while respondent appeals or the People retry him.[137]

While the Court recognizes that Garcia has been imprisoned for a long time, it is not convinced that unconditional release is appropriate here.

### 2. *Prejudice to Retrial*

Garcia nevertheless argues that unconditional release is appropriate because the People should be barred from retrying him.

A court's broad authority to fashion a remedy includes the authority to bar retrial.[138] Such an extreme remedy is typically reserved for cases where the fact of prosecution itself was unlawful, such as in the double jeopardy and *ex post facto* contexts, or where a conditional writ was granted but the state failed to correct the constitutional error within a reasonable period of time.[139] A court may bar retrial, however, even where the constitutional violation is capable of correction, but "where the petitioner[ has] served [an] extended and potentially unjustifiable period[] of

---

sentence").

[137]

The District Attorney has stated that he intends to appeal, *see* Resp. Br. 1-2, and to retry Garcia if the petition is granted conditionally, *see* Hearing, Oct. 26, 2006 at 24.

[138]

*Morales*, 165 F. Supp. 2d at 609 (ordering unconditional release with prejudice to retrial); *see* 2 HERTZ & LIEBMAN § 33.3 & n.13 (citing cases).

[139]

*Morales*, 165 F. Supp. 2d at 609 (citing *Latzer v. Abrams*, 615 F. Supp. 1226, 1229-31 (E.D.N.Y. 1985).

incarceration before the writ was granted."[140]

        *a.*    The *Morales* Case

Garcia points to *Morales v. Portuondo*,[141] where Judge Chin granted unconditional release with prejudice to retrial. Judge Chin there found that an extreme remedy was appropriate for three reasons. First, in light of all the evidence, no reasonable jury could have convicted. The prosecution had no forensic evidence at trial and based its case on a single eyewitness identification of questionable credibility. The petitioners had five alibi witnesses to exculpate them at trial and another individual had since confessed to participating in the crime and exonerated the petitioners.[142]

        Second, the petitioners had been prejudiced severely by the passage of time. Some of their alibi witnesses were dead or unavailable. The remaining witnesses would have been forced to testify to events that occurred fourteen years earlier.[143]

        Third, the prosecution's actions showed that it "was more intent on protecting a conviction than in seeing that justice was done."[144] Among other things, it failed to disclose evidence

---

[140]

        *Id.* (quoting *Latzer*, 615 F. Supp. 1226 at 1230, and citing *United States ex rel. Schuster v. Vincent*, 524 F.2d 153, 154, 158, 162 (2d Cir. 1975) (ordering petitioner's immediate and absolute discharge where he had been confined in state hospital for 31 years without opportunity for sanity hearing and he had been in prison for total of 44 years for crime for which average prison term was 15 years)).

[141]

        *Id.*

[142]

        *Id.* 609-11.

[143]

        *Id.* at 611-12.

[144]

        *Id.* at 612.

48

that would impeach its main witness, improperly pressured witnesses into giving incriminating

testimony, and failed to interview witnesses timely and adequately who it knew might exonerate the

petitioners.[145]


       *b.*     *This Case*

      This is not a case in which barring retrial would be appropriate. While the People

have no forensic evidence and presumably will rely almost entirely on Denor's testimony, this Court

is not now prepared to say that no reasonable jury could convict. Respondent has produced new

evidence establishing a motive and has raised issues about the credibility of the alibi witnesses.

Moreover, Garcia's case has not been prejudiced severely by the passage of time. None of his alibi

witnesses is dead or unavailable. Nor has the credibility of the documentary evidence diminished.

Indeed, Garcia's case is quite strong, even fifteen years later.

      Finally, while the prosecution has been obdurate and perhaps less than fully dedicated

to investigating Garcia's whereabouts on July 16, 1991,[146] there has been no showing of affirmative

misconduct. Garcia has suggested that the prosecution tainted Denor's lineup identification and

concealed the whereabouts of a witness before the hearing.[147] Without a fuller record, however, the

Court is not persuaded that the prosecution's behavior was so outrageous that it should be barred

---

[145]
        *Id.* at 612-14 (finding, in addition, that the prosecution unfairly prejudiced one petitioner
by suggesting he was a gang member and strongly opposed a petitioner's post-conviction
motion even though it subsequently conceded that the conviction must be vacated).

[146]
        *See* Hearing, Oct. 26, 2006 at 9-12.

[147]
        *See id.* at 35-37.

49

from retrying Garcia.

*Conclusion*

This is an exceptionally troubling case. The performance of petitioner's trial counsel was well below minimal standards of competence. In all probability, it resulted in a conviction and fifteen years in prison that otherwise would not have occurred. Nevertheless, despite the plethora of alibi witnesses and other evidence that make out a credible claim of actual innocence, that evidence perhaps is not so conclusive as to preclude a conviction altogether. Given the fact that a murder was committed and the entitlement of the People of the State of New York to a verdict based on all of the probative evidence, the appropriate course is to grant the writ unless petitioner is brought promptly to trial anew.

Respondent's objections to the Report and Recommendation are overruled. Garcia's petition for a writ of habeas corpus is granted conditionally. The writ will issue unless he is retried within 60 days.[148]

SO ORDERED.

Dated:  December 21, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[148]
The Court expresses its appreciation to Martin Klotz and Willkie Farr & Gallagher, who undertook this representation on a *pro bono* basis and with great skill and dedication after the motion to dismiss was denied. Their performance was in the highest tradition of the Bar.